IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KUKUI GARDENS CORPORATION, | ) | Civ. No. 08-00049 ACK-KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HOLCO CAPITAL GROUP, INC., HC | ) | |
| MORTGAGE COMPANY, INC., and | ) | |
| KEVIN C. HORTON, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II OF THE FIRST AMENDED COMPLAINT AS AGAINST DEFENDANT HOLCO CAPITAL GROUP**

**PROCEDURAL BACKGROUND**

On May 25, 2008, Plaintiff Kukui Gardens Corporation ("Plaintiff" or "KGC") filed in this Court a First Amended Complaint ("Complaint") against Holco Capital Group, Inc. ("Defendant Holco" or "Holco"), HC Mortgage Company, Inc. ("Defendant HC Mortgage" or "HCM"), and Kevin C. Horton individually ("Defendant Horton" or "Horton") (collectively, "Defendants").  The Complaint alleges a failure to meet the statutory requirements for release of mortgage, pursuant to Hawai'i Revised Statutes ("H.R.S.") § 506-8 ("Count I"), wrongful conversion of Plaintiff's property ("Count II"), fraud ("Count III"), breach of fiduciary duties ("Count IV"), violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1961 <u>et seq</u>. ("Count V"), malicious, wanton, and intentional actions ("Count VI"), and offset of monies due and owing ("Count VII").  <u>See</u> Compl. at ¶¶ 68-112.

On August 8, 2008, Defendants filed a Motion to Dismiss, seeking dismissal for lack of personal jurisdiction as to Defendant Horton, insufficient service of process as to Defendant Horton, and improper venue as to Defendants Holco, HCM, and Kevin C. Horton, or in the alternative, transfer to the Northern District of Indiana.  On December 19, 2008, this Court denied the motion.

On June 29, 2009, Plaintiff filed the instant motion for Partial Summary Judgment on Count II of the First Amended Complaint for conversion as Against Defendant Holco Capital Group ("MSJ").  Plaintiff's MSJ was accompanied by a memorandum in support of summary judgment ("MSJ Mem.") and a concise statement of facts ("MSJ CSF").

On September 25, 2009, Defendants filed a Memorandum in Opposition to Plaintiff's Motion ("Opposition"), which included a concise statement of facts.[1]

On October 2, 2009, Plaintiff filed a Reply to Defendants' Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Reply").

---

[1] Pursuant to D. Haw. Local Rule 56.1(b) the concise statement of facts should be contained in a separate document.

The Court held a hearing on the October 13, 2009.[2]

## **FACTUAL BACKGROUND**[3]

KGC is a Hawai'i non-profit corporation formed to provide housing for low and moderate income families. See Answer at ¶¶ 1 (Nos. 2, 14), 7 (No. 15). In February 1969, in order to construct a low and moderate income multifamily apartment housing complex in Honolulu ("Kukui Gardens" or "Property"), Plaintiff obtained a $16 million loan from The Ford Foundation, evidenced by a secured note ("Note") that was endorsed and insured by the United States Department of Housing and Urban Development ("HUD"). Id. at ¶ 1 (Nos. 16, 19, 20). The Note was secured by a mortgage ("Mortgage") recorded in both the State of Hawai'i Bureau of Conveyances and the Land Court. Id. at ¶ 1 (No. 21).

As a requirement for obtaining the loan, Plaintiff became subject to a regulatory agreement ("Regulatory Agreement") with HUD that required Plaintiff to establish two accounts to be maintained by the mortgagee ("Replacement Reserve Fund" and "Residual Receipts Fund"). Id. at ¶ 1 (No. 26). Paragraph 2 of the Regulatory Agreement reads:

---

[2] Attorney Mark A. Kaiser appeared as counsel pro hac vice for all Defendants.

[3] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve funds in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Commissioner of an amount equal to $3,019.50 per month unless a different date or amount is approved in writing by the Commissioner.  Such fund whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee . . .

(c) Owners shall establish and maintain, in addition to the reserve fund or replacements, a residual receipts fund by depositing thereto, with the mortgagee, within sixty days after the close of any fiscal year, any residual receipts, as that time is defined herein. Such fund shall be under the control of the Commissioner, and shall be disbursed only on the discretion of the Commissioner who shall have the power and authority to direct that such fund, or any part thereof, be used for such purposes as he may determine.

HUD Regulatory Agreement, MSJ CSF Exhibit KGC-3 ("Regulatory Agreement"); Answer at ¶ 1.  The Replacement Reserve Fund and the Residual Receipts Fund were required to be maintained for the Property by HUD and were governed by HUD regulations.  Answer at ¶ 1; see also Department of Housing and Urban Development, Multifamily Asset Management and Project Servicing Handbook (4350.1) Chapter 4, Sections 4-1, 4-2 ("HUD Handbook").

In 1986, Defendant HC Mortgage purchased the Mortgage through a HUD auction.  Answer at ¶ 1 (No. 22).  HCM was formed by Defendant Horton.  Opposition at 2.  HCM set up a common trust arrangement whereby title and possession of the Note and Mortgage

4

was held by a third party who took the Note and Mortgage as a "mortgage trustee" with HCM servicing the Note and Mortgage. Answer at ¶ 9.  HCM notified Plaintiff of the purchase on or about July 25, 1986, by letter and provided Plaintiff with a written copy of HCM's investment policy.  Letter dated July 25, 1986 from HCMC to KGC, MSJ CSF Exhibit KGC-4 ("Servicing Agreement").

In 1992, Defendant Horton left HCM but five years later agreed to form Holco Capital Group and take assignment of all HCM assets as of January 1, 1998.  Id. at 5.  One of the mortgages Holco received from HCM was Kukui Gardens.  Id.  Since January 1, 1998, Holco has serviced the Note and Mortgage for Plaintiff, and during said time, Horton has been personally involved in servicing the Note and Mortgage for KGC.  Answer at ¶¶ 1 (No. 23), 4, 9.

To carry out its responsibilities under the Regulatory Agreement and manage the Property, Plaintiff employed Hawaiian Properties ("Hawaiian Properties"), a Hawai'i corporation. Declaration of Anthony Lee of Hawaiian Properties, Ltd. ("Lee Declaration") at ¶¶ 4-5.  Each month, Holco would provide Hawaiian Properties with a report of the accounts created under the Regulatory Agreement (the "Accounts").  Id.  At the beginning of each month, Hawaiian Properties would transfer the rent

payments from the Property to Holco to be applied to the Accounts.  Id.

Prior to December of 2007, Plaintiff entered into a purchase and sale agreement for the sale of the Property with Carmel Partners, LLC, and the Hawaii Housing Finance and Development Corporation.  MSJ Mem. at 10.  In order to prepay the remaining amount on the note, Plaintiff was required to obtain the authorization of HUD.  Id.  On September 29, 2006, Plaintiff made a request to Holco to obtain HUD approval for prepayment on the note.  Id. at 11.  In response, Defendant Holco then submitted the early termination request to HUD on October 9, 2006.  Answer ¶ 1 (No. 36).  On December 7, 2007, HUD informed Plaintiff of its consent to allow prepayment of the loan.  MSJ Mem. at 11.

In order to clear title on the Property prior to closing, which was scheduled for December 18, 2007, Plaintiff requested that Defendant Holco release the Mortgage based on HUD's authorization.  Id.  On December 12, 2007, however, Defendant Horton, on behalf of Defendant Holco, sent an e-mail to Plaintiff's attorney requesting over $4 million for obtaining HUD's approval to allow prepayment of the Note and for servicing the Mortgage for twenty-one years, in exchange for the release of the Mortgage.[4/]  MSJ CSF Exhibit BTL-1; Answer at ¶ 11 (No. 43)

---

[4/] Horton's e-mail specifically provided, "given that the servicer is the only party to this transaction to have taken any
(continued...)

("Holco's December 12, 2007 Letter").  In the letter, Holco indicated that it would retain the entire amount of the Replacement Reserve Fund and Residual Receipt Fund as a proposed settlement.[5/]  The following day, Plaintiff sent a letter to Defendant Holco (addressed to Defendant Horton) rejecting the proposed settlement and demanding release of the Mortgage without any further payment so that the title could be cleared.  Letter dated December 13, 2007 from KGC's counsel to Holco, MSJ CSF Exhibit BTL-1; Answer ¶ 11 (No. 43).  Plaintiff's letter requested that Defendants (1) immediately provide it with the final payoff amount in order for the Note and Mortgage to be paid off; and (2) on the date of closing "release and pay to KGC [] all monies, including principal and interest, held in the

---

[4/](...continued)
capital risk, that the servicer has worked for little or nothing and without reimbursement of expenses, that Kukui Gardens received 110% financing from HUD to subsidize this project, that Kukui Gardens has received millions of dollars in management fees since the inception of this project, and that Kukui Gardens now stands to profit from a $132,000,000 sale of formerly publicly financed property, I would ask that you refrain from any moralistic based response."  Holco's December 12, 2007 Letter, MSJ CSF Exhibit BTL-1.

[5/] In Horton's letter he stated, "we owe you $3,155,789.722 plus the other deposit of $966,723.53 for a total of $4,122,513.25 which is less than we are selling our rights to you for plus the mortgage balance.  Given the need to expedite this process we will agree to reduce our demand accordingly and call it even.  Once you have agreed to this, we will forward you all of the documents to you for closing."  Holco's December 12, 2007 Letter, MSJ CSF Exhibit BTL-1.

Replacement Reserves and Residual Reserves, which [were] understood to] total $4,333,348.65." Id.

Despite the inability to obtain a release of the Mortgage, the sale of the Property closed on December 18, 2007, after Plaintiff placed $1,800,000 in escrow to equal the balance due under the Note and Mortgage and an additional $1,800,000 as indemnity for a title company.[6]  MSJ CSF Lau Declaration ¶ 11. On December 24, 2007, Plaintiff again sent a letter to Defendant Holco, requesting the immediate return of all funds and the release of the mortgage, and notifying Defendant Holco of the closing of the Property sale. Id. at 20.  On January 19, 2008, Defendant Horton sent a letter to the title company, stating that Holco was retaining funds until a resolution could be met, but also noting that the Mortgage was paid in full.  Id. at 22; MSJ CSF Exhibit KGC-6; Answer at ¶ 17 (No. 61) ("Holco's January 19, 2008 Letter").  In addition, Holco attached a document entitled "Release of Mortgage" to this letter.  MSJ Mem. at 22; Answer at ¶ 18 (No. 63).[7]

_____

[6] This amount was subsequently reduced when Holco agreed to release the Mortgage by crediting the balance due thereunder against the Replacement Reserve and Residual Receipts funds it held.

[7] The Release of Mortgage, however, has been unrecordable and ineffective in the Hawai'i Land Court and Bureau of Conveyances because of various problems, such as one of its transferees being in bankruptcy.

Upon termination of the HUD regulatory agreement, a HUD funds authorization letter directed Defendants to return the Replacement Reserve Fund and Residual Receipts Fund to Plaintiff. With respect to the Replacement Reserve Fund, HUD has directed that, "[t]he balance in the Reserve for Replacement Fund account, $4,176,703.59 as of 11/30/07 with interest thereon until date of return, shall be returned to Mortgagor Kukui Gardens Corporation." HUD Funds Authorization Letter, MSJ CSF Exhibit KGC-5 at 1 (emphasis added). With respect to the Residual Receipts Fund, HUD has directed that "[t]he balance in the Residual Receipts Fund account, $326,858.18 as of 12/18/07 with interest thereon until date of return, shall be returned to Mortgagor Kukui Gardens Corporation." HUD Funds Authorization Letter, MSJ CSF Exhibit KGC-5 at 1 (emphasis added).

For the calender year of 2007, Plaintiff's required monthly payment into the Replacement Reserve Fund was $186,285 per month, as determined by HUD. MSJ Mem. at 15. On December 17, 2007, Hawaiian Properties received a statement prepared and submitted by Holco reflecting the balances of Replacement Reserve Fund and Residual Receipts Funds as of November 30, 2007. See Holco Mortgagee Statement sent in November of 2007, MSJ CSF Exhibit HP-3 ("Holco November 2007 Statement"). According to this statement, there remained a balance of $4,145,004.36 in the Replacement Reserve Fund, and a balance of $326,858.18 in the

Residual Receipts Fund as of November 30, 2007.  Id.  Of these

funds, Holco has credited $1,800,000 against the Mortgage

balance.  MSJ Mem. at 22; Answer at ¶ 18 (No. 63).  Offsetting

the final mortgage payment and factoring in interest, Plaintiff's

contend that they are owed $2,703,561.77 from Holco.[8/]

**LEGAL STANDARDS**

**I. Summary Judgment**

The purpose of summary judgment is to identify and

dispose of factually unsupported claims and defenses.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary

judgment is therefore appropriate if the "pleadings, the

discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the

governing substantive law, it could affect the outcome of the

case.  A 'genuine issue' of material fact arises if 'the evidence

is such that a reasonable jury could return a verdict for the

nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust &

Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation

---

[8/] Plaintiff has reserved the right to determine the
accuracy of this amount after discovery and to confirm and pursue
any rights it may have against Holco in the event the actual
remaining balances and charges owed under the Note and Mortgage
are less than $1,800,000.

omitted).[9/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller, 454 F.3d at 987.  The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.[10/] Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See id. at 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v.

---

[9/] Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[10/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Miller, 454 F.3d at 987.  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  Id.

Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[11/]
The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630-31.[12/]  Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  Anderson, 477 U.S. at 250-51.

**II. Choice-of-Law**

In diversity cases, the law of the forum state is applied in choice-of-law analyses.  Van Dusen v. Barrack, 376 U.S. 612, 628 (1964).  Because Hawai'i is the forum state, this

---

[11/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[12/] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

Court must analyze which law applies under Hawai'i choice-of-law rules.

Under Hawai'i choice-of-law rules, the Court is to look "to the state with the most significant relationship to the parties and subject matter." Roxas v. Marcos, 89 Hawai'i 91, 117 n. 16, 969 P.2d 1209 (1998). The Hawai'i Supreme Court has instructed this Court to look at factors such as (1) where relevant events occurred, (2) the residence of the parties, and (3) whether any of the parties had any particular ties to one jurisdiction or the other. See id. Further, "there is a presumption that Hawaii law applies unless another state's law 'would best serve the interests of the states and persons involved.'" UARCO Inc. v. Lam, 18 F. Supp. 2d 1116, 1123 (D. Haw. 1998).

Almost all of the factors in this case weigh in favor of Hawai'i law governing the instant dispute. First, the Kukui Gardens property is located in Hawai'i. Second, the Regulatory Agreement in dispute was entered into in Hawai'i. Third, Holco serviced the mortgage by contacting KGC to receive reserve funds and by keeping KGC apprised of the status of these accounts. Finally, this Court recognizes there is a presumption that Hawai'i law applies. See UARCO Inc., 18 F. Supp. 2d at 1123. Accordingly, the Court holds that Hawai'i law will govern with regard to Plaintiff's conversion claim (Count II).

13

### III. Conversion

"The law of conversion is well settled, although case law in Hawaii is scarce." <u>Matsuda v. Wada</u>, 101 F. Supp. 2d 1315, 1321 (D. Haw. 1999). Conversion occurs where one person wrongly exercises dominion over the property of another. <u>Tsuru v. Bayer</u>, 25 Haw. 693, 1920 WL 830, *2 (1920) ("Conversion is any distinct act of dominion wrongfully exerted over another property in denial of or inconsistent with his rights therein.") Further, "[c]onversion may be proved by demand and refusal of possession but evidence of this is not necessary if there is other evidence of actual conversion." <u>Id.</u> Other jurisdictions with a similar approach have held conversion requires (1) plaintiff's ownership or right to possession of the property at the time of conversion, (2) defendants' conversion by wrongful act or disposition of plaintiff's property rights, and (3) damages. <u>See</u> <u>Am. Bankers Mortgage Corp. v. Fed. Home Loan Mortgage Corp.</u>, 75 F.3d 1401, 1411 (9th Cir. 1996) (summarizing California conversion law).

### <u>DISCUSSION</u>

It is undisputed that Holco and Defendants are in possession of the Replacement Reserve Fund and Residual Receipts Fund established by the Regulatory Agreement entered into on February 11, 1969. Opposition at 7-9. Further, it is undisputed that Plaintiff made a request for these funds, and that Defendants have refused to return said funds. <u>See</u> <u>id.</u> If the

14

Replacement Reserve Fund and Residual Receipts Fund do, in fact, belong to Plaintiff, Plaintiff has suffered damages because of Defendants' actions.

The material facts in this case are not in dispute as both parties agree that Plaintiff has been the mortgagor of Kukui Gardens since 1969, at which time the property became a HUD-insured property subject to the Regulatory Agreement.  HUD Regulatory Agreement, MSJ CSF Exhibit KGC-3.  Further, both parties agree that Defendants, in various capacities, have been the servicing mortgagee for Kukui Gardens since 1984.  See Servicing Agreement, MSJ CSF Exhibit KGC-4.  Both parties also agree that Plaintiff was required to deposit funds into two separate reserve accounts known as the Replacement Reserve Fund and Residual Receipts Fund, and that Defendant is currently in possession of the excess of these funds.  Opposition at 7-9. Plaintiff contends, and Defendants dispute, that Defendant Horton judicially admitted that he served as a trustee on behalf of Plaintiff.[13/]  In any event, such a relationship is demonstrated

_____

[13/] Deposition transcripts of Kevin C. Horton on September 22, 2009:

     Q.     Okay. Let's take a look at Section 2-6a - 2-6. Servicing mortgagees have three sets of fiduciary relationships, and both HC Capital and Holco were servicing mortgagees, correct?
     A.     Correct.
     Q.     So this would set forth the fiduciary relationships that those entities had?
     A.     That's correct.
     Q.     Correct?  Okay.  And can you read A for me, please
     (continued...)

15

by other documents.  It is undisputed that the Regulatory

Agreement governs the relationship between the mortgagor and

servicing mortgagee.  And, in fact, this document alone can

establish a fiduciary relationship.  Moreover, the Servicing

Agreement between Plaintiff and Defendants states that the

servicing mortgagee is to invest the Replacement Reserve Fund and

Residual Receipts Fund on behalf of the mortgagor.  Further, in

Horton's letter dated December 12, 2007, in which Horton

suggested that the reserves funds be used to offset the money

owed Defendants, Horton wrote "[a]s for payment, we owe you

$3,155,789.722 plus the other deposit of 996,723.53."  Holco's

December 12, 2007 Letter (emphasis added).  In the same letter,

---

[13]/(...continued)
out loud?
     A.    First, and perhaps most important, is their
fiduciary responsibility to the mortgagors.  The covenants of the
mortgage instrument itself establish this relationship.  One must
notice the implications contained in the title, Deed of Trust.
In this capacity the servicer must, among other tasks: Collect
funds from the mortgagor and apply those funds properly.  Analyze
escrow accounts accurately.  Pay taxes on time to maximize
allowable discounts.  Invest certain escrowed funds, Residual
Receipts, if requested by mortgagor to do so.  Provide
information to the mortgagor, e.g., for example, annual
statements of account, on time.
     Q.    Okay.  Do you dispute that you owe the fiduciary
duties to the mortgagor?
     A.    No.
     Q.    Okay.  So you agree that Holco and HC both owed
those fiduciary duties to the mortgagor?
     A.    I believe that these are fiduciary
responsibilities to the mortgagor.
     Q.    Okay.  But my question is whether or not Holco and
HC owed these fiduciary duties to the mortgagor?
     A.    Yes.

Horton used such terms as "Replacement Reserves Principal Due" and "Total Project Deposits Payable". <u>Id.</u>  Finally, Horton's January 19, 2008, letter to First American Title Company clearly indicates that the escrow balance is being held by Defendants to compensate Defendants for servicing the Mortgage for twenty-one years and for seeking HUD's approval to prepay the note, and does not suggest that the reserve funds belong to Defendants.  <u>See</u> Holco's January 18, 2008 Letter.

It is undisputed that Plaintiff has requested return of the Replacement Reserve and Residual Receipts funds upon prepayment of the mortgage and that Defendants have refused to return said funds.  <u>Id.</u>  Defendants assert, however, that the servicing mortgagee is entitled to the reserve funds under the Regulatory Agreement and relevant HUD Regulations.  Defendants' only evidentiary submission made in support of this position is the Declaration of Kevin Horton ("Horton Declaration") attached to Defendants Opposition.  Although Defendants argue that this creates a material factual dispute, Horton's Declaration merely restates the Defendants' arguments and makes a legal assertion that Defendants are entitled to the reserve fund under the Regulatory Agreement and relevant HUD Regulations.[14/]  Horton's

_____

[14/] The Court recognizes the Ninth Circuit rule that a party may not create an issue of fact by contradicting prior deposition testimony.  <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a (continued...)

bald assertion that Holco always owned the funds cannot be used to create a genuine issue of material fact.  See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (holding that the nonmoving party must set forth significant probative evidence in support of its position to defeat summary judgment).  Horton's bizarre position lacks any supportive case law or logic.  Defendants have asserted a variety of arguments as to why they are entitled to the reserve funds. First, Defendants argue that after termination of the HUD insurance on December 7, 2007, the funds became liquidation funds which belong to the servicing mortgagee.  Second, the Defendants assert that they are entitled to the funds because they sought HUD's approval to permit prepayment of the Note.  Third, the Defendants argue that they are entitled to the reserve funds based on a quantum meruit theory for the years it serviced the Mortgage.  Fourth, and finally, in response to the instant Motion, Defendants argue that the Residual Receipts Fund and

---

$^{14/}$(...continued)
party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.") In this case, Plaintiff asserts that Defendants' claim of ownership in Horton's Declaration is in direct contradiction to Defendants' recognition of a fiduciary duty on behalf of Plaintiff in Horton's Deposition.  The Court notes that Defendants could assert that the fiduciary duty was limited to managing and investing the funds so that they would be available if necessary for the mortgagor, but otherwise said funds belonged to the mortgagee, though this is a weak argument.

Replacement Reserve Fund have always belonged to the servicing mortgagee.

The Court finds no merit in any of Defendants' positions.[15/]   First, as discussed earlier, Defendants have

---

[15/] Notably, whether Defendants maintain a claim based on quantum meruit principles does not affect the outcome of the instant motion because the Court finds that this claim has no merit.  Defendants have asserted an "equitable right to withhold the balance" of the reserve funds.  See Answer at ¶ 19 (No. 64). Further, Defendants have asserted that they are "entitled to compensation for this work under the doctrine of quantum meruit." See Defenses/Affirmative Defenses section of Answer at ¶ 9.  In the opposition to the instant motion, however, Defendants have appeared to abandoned the quantum meruit claim and instead argue that they are entitled to the reserve funds based on the terms and nature of the Regulatory Agreement.  At the hearing on this motion, however, Defendants' attorney contended that their quantum meruit claim was a separate issue, yet it was asserted in an effort to offset, and as a defense to, Plaintiff's conversion claim.  The Court notes that the quantum meruit claim is inconsistent with Defendants' current position that they have always owned the reserve funds.  Even if Defendants still maintain their quantum meruit claim, summary judgment as to the conversion claim is still appropriate because the existence of a counterclaim for quantum meruit does not entitle Holco to retain the funds.  See, e.g., Matsuda v. Wada, 101 F. Supp. 2d 1315 (D. Haw. 1999) (granting partial summary judgment as to a conversion claim where it was clear plaintiff owned the property and defendant's only claim of right was based on quantum meruit principles).  Moreover, the Court is unpersuaded by Holco's quantum meruit claim as the HUD Handbook specifically states that a servicing mortgagee may be compensated by a mortgagor for its services only if there is a separate agreement detailing the terms of the compensation agreement.  See HUD Handbook 4350.1 Chapter 4 ("If a mortgagee proposes to assess charges for investing the Reserve Fund, the Field Office Loan Management staff are reminded to examine the Mortgagees Certificate for the project to see if any fees or charges for making or accepting investments were disclosed or stated.  Any fees so collected by the insured or coinsured mortgagee may only be collected according to an agreement between the mortgagee and the mortgagor.")

admitted through correspondence that the Replacement Reserve and Residual Receipts funds belong to Plaintiff (for example, Holco's December 12, 2007 letter stated "we owe you $3,155,789.722 plus the other deposit of 996,723.53" and used such terms as "Replacement Reserves Principle Due" and "Total Project Deposits Payable").  Moreover, Defendants have admitted Plaintiff's ownership of the Replacement Reserve and Residual Receipts funds by crediting the payment of the balance of $1,800,000 owed on the Mortgage against said funds.  Second, the Court also notes that HUD has directed Defendants to transfer the Replacement Reserve and Residual Receipts funds to Plaintiff.  Third, Defendants' Servicing Agreement provides that the reserve funds will be invested on behalf of the mortgagor.  Fourth, the Regulatory Agreement, HUD Handbook, and 2001 HUD Legal Opinion further clarify that the Replacement Reserve and Residual Receipts funds belonged to the mortgagor.  Fifth, case law establishes that said reserve funds belong to the mortgagor.

The Regulatory Agreement does not explicitly state that the mortgagor is the owner of the Replacement Reserve Fund and the Residual Receipts Fund and that said funds must be turned over to the mortgagor after the mortgage has been paid in full, perhaps because this proposition is too obvious.  Additionally, the governing HUD Regulations do not explicitly state that the mortgagor is entitled to the Replacement Reserve and Residual

Receipts funds at the end of a mortgage, absent default.  Again, this might be a result of the proposition being so obvious given the nature and purpose of HUD provided multifamily housing project insurance.  The Court has turned to a variety of sources from the HUD Handbook on Servicing Mortgages to Ninth Circuit case law in determining who owns the Replacement Reserve and Residual Receipts funds from Kukui Gardens.  Notably, <u>every</u> source the Court has consulted suggests that absent default, a mortgagor is entitled to the Replacement Reserve and Residual Receipts funds and these funds must be returned to the mortgagor upon prepayment of the mortgage.

## I. The Regulatory Agreement and Servicing Agreement

The Regulatory Agreement governing Kukui Gardens required the mortgagor to establish two reserve funds, a Replacement Reserve Fund and a Residual Receipts Fund. Regulatory Agreement 2(a) & 2(c).  The agreement does not expressly state that the mortgagee is entitled to either of the funds, rather that during the term of the agreement the mortgagee "controls" the Replacement Reserve Fund, and the HUD Commissioner "controls" the Residual Receipts Fund.  <u>Id.</u> at 2(a) & 2(c). Defendants rely heavily on the use of the word "control" to argue that this establishes that the mortgagee owns the funds. Opposition at 5-6.  The use of the word control, however, merely establishes that these funds are to be held in trust by the

21

mortgagee.  Indeed, the servicing agreement between Plaintiff and Defendants[16/] noted that it was the policy of the servicing mortgagee to "invest escrow funds <u>on behalf of the mortgagor</u>." Servicing Agreement, MSJ CSF Exhibit KGC-4 (emphasis added). Defendants' reliance on the word "control" is therefore misplaced because it merely established a trust relationship between the mortgagor and mortgagee, which is clearly evidenced by Defendants' own servicing agreement.  Accordingly, the Regulatory Agreement and Servicing Agreement indicate that mortgagor is entitled to the Replacement Reserve and Residual Receipts funds upon prepayment of the mortgage.

Unable to cite any legal authority in support of Defendants' opposition to the instant motion, Defendants rely heavily on the use of hypothetical situations.  First, Defendants note that if Plaintiff had defaulted, the Defendants "could have applied the replacement reserve funds and residual receipts funds to cure the default."  Opposition at 7.  Accordingly, Defendants argue that this is "conclusive evidence of the mortgagee's ownership of these funds."  Id. at 8.  Defendants fail to recognize, however, that this does not constitute conclusive

---

[16/] Holco's predecessor, HCM, provided KGC with a servicing agreement regarding compensation for investing reserve funds. MSJ CSF Exhibit KGC-5.  Holco admitted that the servicing agreement was never modified or changed and remained in effect the entire time HCM and Holco serviced the loan for Plaintiff. Holco Transcript at p. 173-174.

evidence of ownership but rather describes the _purpose_ of a replacement reserve fund.  The replacement reserve fund is designed to protect HUD's insured interest in the regulated property by providing funds for property repair, as well as to protect against a mortgagor's default.  _See_ 24 C.F.R. § 248.201 ("[T]he escrow fund established under the regulatory agreement [is] for the purpose of ensuring the availability of funds for needed repair and replacement costs."); _see also_ _id._ § 242.1 ("The purpose of the fund is to provide HUD a means to assist the [mortgagor] to avoid mortgage defaults and to preserve the value of the mortgaged property and the [mortgagor's] business.")  The Defendants' hypothetical, therefore, provides no support to Defendants' claim of ownership; rather it describes the purpose of the reserve fund to begin with.

Defendants' second hypothetical states:

> If Holco had refused to procure HUD's termination of its insurance and/or if HUD had refused Holco's request to terminate its insurance, and if [the current purchaser] had still decided to purchase the property from KGC with the existing note, mortgage and regulatory agreement still effective, then the replacement reserve funds and residual reserve funds would have stayed on deposit in Holco's sole possession, and Holco and HUD would have continued to exercise control over these funds.

Opposition at 9.  Again, this provides no support for Defendants' claim of ownership but merely recognizes that Defendants' would _continue_ to hold the reserve funds in trust for the new mortgagor.  Moreover, these are not the facts of the instant

case.  After receiving HUD's permission to prepay the Mortgage,
HUD has requested that the funds be returned to the mortgagor.
Specifically, HUD has directed that "[t]he balance in the Reserve
for Replacement Fund account, $4,176,703.59 as of 11/30/07 with
interest thereon until date of return, shall be returned to
Mortgagor Kukui Gardens Corporation."  HUD Funds Authorization
Letter, MSJ CSF Exhibit KGC-5 at 1.  In addition, HUD also has
directed that "[t]he balance in the Residual Receipts Fund
account, $326,858.18 as of 12/18/07 with interest thereon until
date of return, shall be returned to Mortgagor Kukui Gardens
Corporation."  Id. at 3.  In short, even Defendants' hypothetical
situations suggest that the mortgagor is entitled to reserve
funds upon prepayment of the mortgage.

**II. HUD Regulations**

        Although there are no HUD Multifamily Regulations
specifically addressing the issue before the Court, several
applicable HUD Regulations define the trust relationship between
mortgagor and servicing mortgagee.  HUD regulations that address
the taxability of 221(d)(3) projects take care to define a
"Trustee" as "the entity that has legal responsibility under the
trust indenture for disposition of the proceeds of a bond
issuance and servicing of the debt represented by the
obligations."  24 C.F.R. § 811.102.  Applicable HUD Regulations
indicate that the HUD Commissioner may induce an owner to

continue to extend low income use of the project by "termination of HUD's limitations on distributions, and release of residual receipts and reserve for replacement funds, through prepayment of the mortgage." Id. § 248.231.  If the HUD Commissioner is permitted to release reserve funds to induce a mortgagor to extend low income housing, it stands to reason then that the mortgagor is the owner of the Replacement Reserve and Residual Receipts funds.  Indeed, all of the applicable HUD Regulations suggest the same conclusion, that a mortgagor is entitled to reserve funds upon prepayment of a HUD-insured mortgage.

### III. HUD Guidelines

Perhaps most persuasive in the instant case are the HUD Handbook Guidelines regarding Multifamily Asset Management Project Servicing.  HUD Guidelines confirm that the mortgagor owns the Replacement Reserve and Residual Receipts funds, and that Holco as servicing mortgagee had a fiduciary duty[17/] to collect and handle said reserve funds properly, and held the Replacement Reserve and Residual Receipts funds in trust for the mortgagor.

---

[17/] The HUD Handbook defines a fiduciary as follows: "One acts in a 'fiduciary capacity,' or receives money or contracts a debt in a 'fiduciary capacity,' when the business that he transacts or the money or property that he handles is not his own or for his own benefit but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."  HUD Handbook 4350.4 Chapter 2.

The HUD Handbook is "the primary handbook used by Field Office Loan Management multifamily staff in carrying out their asset management and loan servicing responsibilities in monitoring and assisting owners/managing agents to maintain projects in good physical and financial condition."  HUD Handbook 4350.1 Chapter 1.  The HUD Handbook is careful to note that "during the life of the mortgage . . . Residual Receipts are an asset of the mortgagor held under HUD control."  HUD Handbook 4350.1 Chapter 25.  The HUD Handbook is replete with references to the servicing mortgagee acting as a fiduciary on behalf of the mortgagor.[18]

A servicer mortgagee is an agent that is employed by the investing mortgagee and acts on the investing mortgagee's behalf.  HUD Handbook 4350.4 Chapter 1.  The HUD Handbook expressly states that the Reserve Fund for Replacements and Residual Receipts Fund are an asset of the mortgagor.  HUD Handbook 4350 Chapter 1 ("The mortgagee must permit the investment of the mortgagor's money held in the Reserve Fund for

---

[18] "Servicing mortgagees have three sets of fiduciary relationships."  HUD Handbook 4350.4 Chapter 2.  "First, and perhaps most important, is their fiduciary responsibility to mortgagors.  The covenants of the mortgage instrument itself establish this relationship."  Id.  "Servicing mortgagees need to remember their fiduciary responsibilities to mortgagors when establishing a fee structure for investing Residual Receipts and Replacement Reserve funds.  They should recover only their actual administrative costs, which should never exceed 25 per cent of the interest earned from the investment."  Id.

Replacements and the Residual Receipts trust accounts.")  The servicing mortgagee is to be compensated by the investing mortgagee, not by obtaining an ownership interesting in the reserve fund.  HUD Handbook 4350 Chapter 1 ("Essentially, the investing mortgagee pays the servicing mortgagee to provide an array of services to the mortgagor.")  More specifically, the HUD Handbook mandates that in order for a servicing mortgagee to collect fees from a mortgagor for investing reserve funds, there must be a separate agreement between the mortgagor and mortgagee. See HUD Handbook 4350.1 Chapter 4; see also HUD Handbook 4350.4 Chapter 2 ("Mortgagees are to collect their investment charges, if any are made, separately and apart from other collections from the mortgagor.")  In this case, nowhere in the Servicing Agreement does the agreement state that Defendants are entitled to ownership of the reserve funds.  See MSJ CSF Exhibit KGC-4 at 4.  To the contrary, the Servicing Agreement states investments shall be made "on behalf of mortgagors."  Id.  The servicing mortgagee is compensated by assessing fees for each transaction as the Servicing Agreement describes the charges it will assess for each type of transaction.  Id. (charging $50 per transaction when the servicing mortgagee places funds into a certificate of deposit with a maturity not in excess of three months and $100 per transaction when the servicing mortgagee places funds in U.S. Treasury Bills).

27

In sum, the HUD Handbook unequivocally confirms that a
servicing mortgagee acts as a trustee on behalf of the mortgagor
and that the Replacement Reserve and Residual Receipts funds are
the property of the mortgagor, absent a separate agreement
assessing minimal service charges for investing said funds.  In
the event of prepayment of a mortgage, the mortgagor would thus
be entitled to the mortgagor's own funds.

**IV. Case Law**

The Ninth Circuit has recognized that a mortgagor is
entitled to replacement reserve funds absent a default in
mortgage payments.  United States v. Queen's Court Apartments,
Inc., 296 F.2d 534, 538 (9th Cir. 1961); see also United States
v. Pine Hill Apartments, 261 F.2d 667, 671 (5th Cir. 1958)
(noting that there is no requirement for the mortgagee to use the
reserve funds account to prevent mortgagor from defaulting which
suggests that the funds belonged to the mortgagor prior to
default).  In Queens Court, after a mortgagor defaulted on a
payment the mortgagee, HUD in this instance, demanded the
principal sum and accrued interest be paid immediately pursuant
to the mortgage's acceleration clause.  296 F.2d at 534.  The
mortgagor contended, however, that the mortgagee was required to
use the replacement reserve fund to prevent the mortgagor's
default.  Id.  The Ninth Circuit held that the mortgagee was not
required to use the replacement reserve fund to pay the

28

mortgagor's monthly payment and noted that the purpose of the reserve fund was to protect against default by a mortgagor.  Id. at 538.  The court also mentioned, however, that after foreclosure the mortgagor is entitled to the replacement reserve funds if there is no deficiency.  Id.  It stands to reason then that if a mortgagor may recover replacement reserve funds in the event of a default, a mortgagor is entitled to all replacement reserve funds upon proper prepayment of a mortgage.

The Fourth Circuit has also noted that residual receipts are the property of the mortgagor and must be returned to the mortgagor at the end of the mortgage agreement absent default.  Stendig v. United States, 843 F.2d 163, 166-67 (4th Cir. 1988).[19/]  In Stendig, the Court held that "after the mortgages are paid [both the operating and replacement reserve] will be turned over to the [mortgagor]."  Id. at 164.  The mortgagor had argued that the replacement reserve fund and operating reserve account should not be taxable because they were controlled by a regulatory agreement, but the Fourth Circuit held that the housing authority's "temporary control over the disposition of the funds is but a consequence of the Stendigs' voluntary election to obtain the financial advantages that low

---

[19/] Notably, in Stendig, the Virginia Housing Development Authority (VHDA) financed the construction of the project, but the regulatory scheme and regulatory agreement were very similar to HUD's regulatory program.

income housing investments such as these provide." Id. at 166. Although Stendiq dealt with replacement reserve funds from a tax perspective, the mortgagor's ownership of the funds was a central aspect of the court's holding. Therefore, case law in both the Ninth and Fourth circuits suggest that upon prepayment of a mortgage, the mortgagor is entitled to the reserve funds.

**V. HUD 2001 Legal Opinion**

A fairly recent HUD legal opinion addressing this issue indicated that the mortgagor is entitled the funds at the end of the mortgage absent default.

In a 2001 HUD Legal Opinion, HUD noted that:

> HUD's position is that, although the loan is FHA-insured, the [replacement reserve fund] is an asset of the project which is under the control of HUD and, as long as the requirements of the [regulatory agreement] have not been violated, would remain with the project until the FHA-insured mortgage reaches maturity or is otherwise paid in full. Upon prepayment or maturity of the insured mortgage loan (and termination of the [regulatory agreement]), the funds in the [replacement reserve fund] would not revert to HUD. The funds would remain with the project owner.

HUD Legal Opinion CIM-0122, Letter from John J. Daly, Associate General Counsel for Insured Housing, to Christopher C. O'Dell, Attorney at Moss & O'Dell (September 12, 2001). This opinion addressed the issue of the disposition of reserve funds after an insured mortgage loan is refinanced with a mortgage loan not insured by the Federal Housing Administration.

As evidenced above, every source the Court has examined unequivocally confirms that the Replacement Reserve Fund and Residual Receipts Account are assets of the mortgagor and upon prepayment of the mortgage must be returned to the mortgagor. Moreover, these sources do not present <u>even the slightest suggestion</u> that the Defendants may be entitled to the reserve funds.  The Defendants' entire defense boils down to irrelevant hypothetical situations and reference to the word "control" in the Regulatory Agreement.  Accordingly, the Court finds that Plaintiff is the proper owner of the Replacement Reserve Fund and Residual Receipts Fund amounting to $2,703,561.77 after offsetting the final mortgage payment.

**VI. Change in Residual Receipts Regulations 1979/1980**

Although not briefed by the parties, the Court finds it prudent to determine whether the Residual Receipts Fund must be remitted to HUD pursuant to current HUD Regulations, or whether the Residual Receipts Funds belong to the mortgagor.

In 1980, HUD Regulations governing the disposition of residual receipts were amended to provide that "upon termination of the Contract, any excess funds must be remitted to HUD."  24 C.F.R. § 880.205(e) (effective March 24, 1980).  Prior to this amendment, however, HUD Regulations did not address the disposition of residual receipts funds upon termination of a

31

regulatory agreement.[20/]   Indeed, a recent HUD audit report has confirmed that "before 1979/1980, HUD's housing assistance payments contracts did not contain provisions regarding residual receipt use."  HUD Office of Inspector General Audit Report 2007-KC-0002, Letter from Ronald J. Hosking, Regional Inspector General for Audit, 8AGA, to Charles H. Williams, Deputy Assistant Secretary for Multifamily Housing Programs (January 29, 2007); see also Kelly B. Bissinger, HUD Inspector General Cracks Down on the Use of Residual Receipts, Martin Dale, July 27, 2009, at 1 ("By way of background, in 1979/1980, HUD changed the regulations controlling the use of Residual Receipts . . . [residual receipts from projects receiving approval before 1979] are released to the property owner when the regulatory agreement terminates.") Accordingly, projects approved prior to 1979 are entitled to receive the remaining residual receipts fund upon prepayment of the mortgage.  See generally HUD Legal Opinion GCH-0088, Letter from Michael H. Reardon, Assistant General Counsel, to Harold Leby, Attorney at Brownstein Zeidman & Lore (October 27, 1993) (noting that the new regulations only apply to projects in which "initial application was submitted on or after [February 29, 1980].  Projects for which applications or proposals were

---

[20/] The Court has reviewed the 1979 version of 24 C.F.R. §§ 800-803 and has found no provision addressing the disposition of the Residual Receipts Fund upon termination of the regulatory agreement.

submitted before [February 29, 1980] will be processed under the regulations and procedures in effect at the date of submission").

In this case, the Regulatory Agreement was entered into on February 11, 1969.  Therefore the project is not subject to the revised 1980 HUD Regulations requiring non-profit mortgagors to turn over the balance of the residual receipts fund to HUD upon termination of the agreement.  As indicated above, in projects approved prior to the 1979/1980 amendments, the residual receipts fund is an asset of the mortgagor and the mortgagor is entitled to the funds upon prepayment of the mortgage.  In fact, in a HUD Funds Authorization letter, HUD has directed that the Residual Receipts Fund be turned over to Plaintiff.  See HUD Funds Authorization approved on May 21, 2009, MSJ CSF Exhibit KGC-5 at 3 ("The balance in the Residual Receipts Fund account, $326,858.18 as of 12/18/07 with interest thereon until date of return, shall be returned to Mortgagor Kukui Gardens Corporation.")

## VII. Conversion Claim

The Court finds that at the time Plaintiff requested return of the funds, (1) Plaintiff had ownership or a right to possession of the funds, (2) Defendant Holco[21/] refused to return these funds which Defendant admittedly possessed, and (3)

---

[21/] The Court notes that Plaintiff has only requested Partial Summary Judgment on Count II as to Defendant Holco Capital.

Plaintiff suffered damages as a result.   See Am. Bankers Mortgage Corp., 75 F.3d at 1411.   Having concluded that both the Replacement Reserve Fund and Residual Receipts Fund belong to Plaintiff, the Court finds that Defendant Holco, construing all evidence and reasonable inferences drawn therefrom in a light most favorable to Defendant, converted the funds of Plaintiff in the amount of $2,703,561.77, thus warranting summary judgment.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff Kukui Gardens's Motion for Partial Summary Judgment on Count II of the First Amended Complaint as to Defendant Holco Capital Group.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, October 15, 2009.



_____
Alan C. Kay
Sr. United States District Judge


Kukui Gardens Corporation v. Holco Capital Group, et al., Civ. No. 08-00049 ACK-KSC: Order Granting Plaintiff's Motion for Partial Summary Judgment on Count II of the First Amended Complaint as Against Defendant Holco Capital Group.