IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

KUKUI GARDENS CORPORATION,    )   Civ. No. 08-00049 ACK-KSC
    )
        Plaintiff,    )
    )
   v.    )
    )
HOLCO CAPITAL GROUP, INC., HC    )
MORTGAGE COMPANY, INC., and    )
KEVIN C. HORTON, individually,    )
    )
        Defendants.    )
_____ )

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II OF THE FIRST AMENDED COMPLAINT FOR CONVERSION AS AGAINST DEFENDANT HORTON**

**PROCEDURAL BACKGROUND**

On May 23, 2008, Plaintiff Kukui Gardens Corporation ("Plaintiff" or "KGC") filed in this Court a First Amended Complaint ("Complaint") against Holco Capital Group, Inc. ("Defendant Holco" or "Holco"), HC Mortgage Company, Inc. ("Defendant HC Mortgage" or "HC Mortgage" or "HCM"), and Kevin C. Horton individually ("Defendant Horton" or "Horton") (collectively, "Defendants"). The Complaint alleges a failure to meet the statutory requirements for release of mortgage, pursuant to Hawai'i Revised Statutes ("H.R.S.") § 506-8 ("Count I"), wrongful conversion of Plaintiff's property ("Count II"), fraud ("Count III"), breach of fiduciary duties ("Count IV"), violations of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq. ("Count V"), malicious, wanton, and intentional actions ("Count VI"), and offset of monies due and owing ("Count VII").  See Compl. at ¶¶ 68-112.

On June 29, 2009, Plaintiff filed a motion for Partial Summary Judgment on Count II of the Complaint for conversion as Against Defendant Holco Capital Group ("MSJ Against Holco").  On October 13, 2009, the Court held a hearing on the MSJ Against Holco.  On October 15, 2009, the Court entered an Order granting Plaintiff's MSJ Against Holco, finding that Holco converted the Replacement Reserve and Residual Receipts funds that belonged to Plaintiff ("10/15/09 Order").[1]

On November 13, 2009, Plaintiff filed the instant motion for Partial Summary Judgment on Count II of the First Amended Complaint for conversion as Against Defendant Horton ("MSJ Against Horton").  Plaintiff's MSJ Against Horton was

---

[1] It its 10/15/09 Order, the Court found:

> [T]hat at the time Plaintiff requested return of the funds, (1) Plaintiff had ownership or a right to possession of the funds, (2) Defendant Holco refused to return these funds which Defendant admittedly possessed, and (3) Plaintiff suffered damages as a result.  Having concluded that both the Replacement Reserve Fund and Residual Receipts Fund belong to Plaintiff, the Court finds that Defendant Holco, construing all evidence and reasonable inferences drawn therefrom in a light most favorable to Defendant, converted the funds of Plaintiff in the amount of $2,703,561.77, thus warranting summary judgment.

10/15/09 Order at 33-34 (citations and footnote omitted).

accompanied by a memorandum in support ("MSJ Against Horton Mem.") and a concise statement of facts ("MSJ Against Horton CSF").

On December 28, 2009, Defendants filed a Memorandum in Opposition to Plaintiff's MSJ Against Horton ("Opposition"), which included a concise statement of facts.[2]

On January 5, 2010, Plaintiff filed a Reply to Defendants' Memorandum in Opposition to Plaintiff's MSJ Against Horton ("Reply").

The Court held a hearing on the MSJ Against Horton on January 12, 2010.[3]

## FACTUAL BACKGROUND[4]

As the parties and the Court are familiar with the facts and background of this case, the Court will only present the basic factual background and those facts bearing relevance to the instant MSJ Against Horton.

Plaintiff is a Hawai'i non-profit corporation formed to

---

[2] At the request of the parties, the Court, by way of entering order, extended Defendants' opposition deadline to December 28, 2009, and Plaintiff's reply deadline to January 5, 2010, at noon.

[3] Attorney Mark A. Kaiser appeared as counsel pro hac vice for all Defendants.

[4] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

provide housing for low and moderate income families.  <u>See</u> Answer at ¶¶ 1 (Nos. 2, 14), 7 (No. 15).  In February 1969, in order to construct a low and moderate income multifamily apartment housing complex in Honolulu ("Kukui Gardens" or "Property"), Plaintiff obtained a $16 million loan from The Ford Foundation, evidenced by a secured note ("Note") that was endorsed and insured by the United States Department of Housing and Urban Development ("HUD").  <u>Id.</u> at ¶ 1 (Nos. 16, 19, 20).  The Note was secured by a mortgage ("Mortgage") recorded in both the State of Hawai'i Bureau of Conveyances and the Land Court.  <u>Id.</u> at ¶ 1 (No. 21).

As a requirement for obtaining the loan, Plaintiff became subject to a regulatory agreement ("Regulatory Agreement") with HUD that required Plaintiff to establish two accounts, a Replacement Reserve Fund and a Residual Receipts Fund, to be maintained by the mortgagee (collectively, "reserve funds").  <u>Id.</u> at ¶ 1 (No. 26).  Section 2 of the Regulatory Agreement provides:

> 2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve funds in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Commissioner of an amount equal to $3,019.50 per month unless a different date or amount is approved in writing by the Commissioner.  Such fund whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee . . .

> (c) Owners shall establish and maintain, in addition to the reserve fund or replacements, a residual receipts fund by depositing thereto, with the mortgagee, within sixty days after the close of any fiscal year, any residual receipts, as that time is defined herein.  Such fund shall be under the control of the Commissioner, and shall be disbursed only on the discretion of the Commissioner who shall have the power and authority to direct that such fund, or any part thereof, be used for such purposes as he may determine.

Regulatory Agreement, MSJ against Holco CSF Exhibit KGC-3 § 2;

Answer at ¶ 1.  In opposition to the current MSJ against Horton,

Defendants point to sections 11(a)(2) and 15 of the Regulatory

Agreement.  As discussed below, neither of these sections appear

to be relevant to the instant case.  Section 11(a)(2) of the

Regulatory Agreement provides:

> If said note is not held by the Commissioner - notify the holder of the note of such default and request the holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner [of HUD] as provided in the Regulations[.]

Id. at § 11(a(2).  In addition, § 15 of the Regulatory Agreement

provides:

> This instrument shall bind, and the benefits shall insure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and the Commissioner and his successors so long as the contract of the mortgage insurance continues in effect, and during such further time as the Commissioner [of HUD] shall be the owner, holder,

or reinsurer of the mortgage, or obligated to reinsure the mortgage.

Id. at § 15.   The Replacement Reserve Fund and the Residual Receipts Fund were required to be maintained for the Property by HUD and were governed by HUD regulations.   Answer at ¶ 1; see also Department of Housing and Urban Development, Multifamily Asset Management and Project Servicing Handbook (4350.1) Chapter 4, §§ 4-1, 4-2 ("HUD Handbook").

In 1986, Defendant HC Mortgage, formed by Horton, purchased the Mortgage through a HUD auction.   Id. at ¶ 1 (No. 22).   HC Mortgage serviced the Note and Mortgage between 1986 and 1997.   Id. at ¶ 9.

In 1992, Horton left HC Mortgage, but five years later formed Holco Capital Group, Inc. and agreed to take assignment of all HC Mortgage assets as of January 1, 1998.[5]   Id. at ¶ 4.   One of the mortgages Holco received from HC Mortgage was the Kukui Gardens Mortgage.   Id.   Since January 1, 1998, Holco has serviced

---

[5] Horton further explained:

> From 1992 to 1997, [Horton] no longer associated with HCM, HCM had accumulated losses in excess of $2.5 million and was unmarketable, and the Holladay Corporation had assumed much of the responsibility for the failing HCM portfolio.   Via an agreement with the Halladay Corporation, in 1997, [Horton] formed Holco and Holco secured HCM's assets and assumed HCM's liabilities.

Opposition at 3.

the Note and Mortgage for Plaintiff.[6/]  From its inception,

Horton has held the position as President of Holco and all acts

by Holco were done by Horton in his capacity as President.[7/]

Answer at ¶¶ 1 (No. 23), 4, 9; MSJ Against Horton CSF Ex. B,

Deposition testimony of Horton dated September 22, 2009 at

213:17-22 ("Horton Deposition").  When Holco was formed, Horton

_____

[6/] As part of servicing the Mortgage, Defendants received
payments from Plaintiff.  Defendants described the process as
follows:

> The regulatory agreement required KGC to make
> monthly payments to the mortgagee for replacement
> reserves.  Once annually KGC was required to make
> a payment to the mortgagee for residual receipts.
> Every month KGC wired one mortgage payment for
> principal and interest, hazard insurance, taxes,
> and replacement reserves.  Once each year,
> following and audit of KGC's books, KGC was
> required to remit to Holco all of its surplus cash
> that it had secured throughout the previous year
> to be deposited into a residual receipts fund . .
> . .

Opposition at 4.

[7/] Horton admitted at his deposition that all acts by Holco
were done by Horton in his capacity as President:

> Q.   (By Mr. Gall) Paragraph 13, is it correct
>      that all acts of Holco were done by you in
>      your capacity as president?
> A.   Yes, sir.
> Q.   Holco did not act unless you did something,
>      is that correct?
> A.   That's correct.

See Horton Deposition at 213:17-22.

was the President, a shareholder,[8/] and the sole employee.  See

MSJ Against Horton Mem. at 4; see also Horton Deposition at 26:8-

14.  As of 2007, Horton is the sole officer of Holco.  Horton

Deposition 28:18-23.  Additionally, Horton has confirmed that,

other than his attorney, there is no other person who would have

knowledge regarding the factual allegations and alleged causes of

action set forth in the Complaint in this case.  See id. at 34:9-

24.

     In 2007, KGC entered into a purchase and sale agreement

of the Property.  Compl. at ¶¶ 31, 34-37.  The Regulatory

Agreement, however, required that the mortgagee obtain HUD's

approval in order for the mortgagor to prepay the Note and

Mortgage.  Id.  On December 7, 2007, Holco obtained approval from

HUD to allow prepayment of the loan and to proceed with the sale

of the Property.  Id. ¶ 37.  In order to clear title on the

Property prior to closing, which was scheduled for December 18,

2007, Plaintiff requested that Defendants release the Mortgage

based on HUD's authorization.  Id.  On December 12, 2007,

however, Defendant Horton, on behalf of Holco, sent an e-mail to

---

[8/] Paul Crowley, who was the attorney that assisted Horton
in forming Holco, was also initially a shareholder until around
April of 1999.  See Horton Deposition at 27:1-13.  Around April
of 1999, after Horton bought Mr. Crowley's shares, he stayed on
as a secretary of Holco primarily for estate purposes, where his
duties were limited to taking minutes of the annual meeting and
making sure that the records were filed.  Id. at 27:21-25-28:7-
14.  Mr. Crowley served as secretary until 2007.  Id. at 28:7-9.

Plaintiff's attorney requesting over $4 million for obtaining HUD's approval to allow prepayment of the Note and for servicing the Mortgage for twenty-one years, in exchange for the release of the Mortgage.[9/]  MSJ Against Holco CSF Exhibit BTL-1 ("Holco's December 12, 2007 Letter"); Answer at ¶ 11 (No. 43).  In the December 12, 2007 Letter, Horton, on behalf of Holco, indicated that he would retain the entire amount of the Replacement Reserve and Residual Receipts funds as a proposed settlement.[10/]  In his deposition, Horton admitted that he was the one who came up with the position that Holco was entitled to the reserve funds,[11/] and

---

[9/] Defendants initially asserted that they were entitled to the balance of the funds because Holco had obtained approval for the prepayment of the Note and Mortgage and for having serviced the Mortgage.  Subsequently, in response to the MSJ Against Holco, Defendants asserted that they always owned the reserve funds.

[10/] In Horton's letter he stated, "we owe you $3,155,789.722 plus the other deposit of $966,723.53 for a total of $4,122,513.25 which is less than we are selling our rights to you for plus the mortgage balance.  Given the need to expedite this process we will agree to reduce our demand accordingly and call it even.  Once you have agreed to this, we will forward you all of the documents to you for closing."  Holco's December 12, 2007 Letter, MSJ Against Holco CSF Exhibit BTL-1.

[11/] Horton explained:

> Q.   (By Mr. Gall) Okay.  Are you aware - and let
>      me - just to make sure I ask the right
>      question, I understand it's your position
>      that upon termination of the regulatory
>      agreement the funds changed in character from
>      reserve funds to liquidation funds, is that
>      correct?
> A.   That's what I call them, yes.

(continued...)

that he developed this position in response to the particular

circumstances.[12/]  The following day, Plaintiff sent a letter to

---

[11/](...continued)

> Q.   It's important that I understand exactly what
>      you call them.  And for the record, could you
>      once again say what you call them?
> A.   I call them liquidation funds.
> Q.   Okay.  Is there any definition as to
>      liquidation funds contained in the regulatory
>      agreement?
> A.   No, there's not.
> Q.   Is there anything in the regulatory agreement
>      that states that the reserve funds turn into
>      liquidation funds?
> A.   No, there's not.
> Q.   Where did you get your understanding of the
>      liquidation funds?
> A.   Well, based upon my premise that at the point
>      in time that they terminate their insurance,
>      all contractual obligations of the mortgagor
>      or the mortgagee and HUD's - HUD's
>      responsibility to that project cease to
>      excess [sic], okay, at which time there is --
>      the regulatory agreement's completely silent
>      on what to do with those funds.  Okay.  Those
>      funds are under my control to be disbursed in
>      my opinion in a matter that I see fit.  They
>      were under no one else's control.
> Q.   Okay.  Are you aware anywhere where there's a
>      definition of liquidation funds?
> A.   No, there's not.

See Horton Deposition at 116:9-25-117:1-17.

[12/]  Horton also stated:

> Q.   (By Mr. Gall) So my question is whether or
>      not that's standard within the HUD mortgage
>      industry [that reserve funds turn into
>      "liquidation funds"].
> A.   I have no idea.
> Q.   Okay.  Have you ever heard of this theory
>      being applied in any other case?
> A.   No, I have not.

(continued...)

Holco, addressed to Horton, rejecting the proposed settlement and demanding release of the Mortgage without any further payment so that the title could be cleared.  Letter dated December 13, 2007 from KGC's counsel to Holco, MSJ Against Holco CSF Exhibit BTL-1.  Plaintiff's letter also requested that Defendants return all of the funds held in the Replacement Reserve Fund and Residual Receipts Fund accounts.  Id.  Defendants refused to return the Replacement Reserve and Residual Receipts funds, and thereafter Horton proceeded to use the funds to pay off creditors and lenders."[13]  See Horton Deposition at pp. 54-64, 83-84.

_____

[12](...continued)
| | | |
|---|---|---|
| Q. | Is this something that you just came up with yourself? | |
| A. | Well, no.  What do you mean came up with, by definition? | |
| Q. | How did you develop this view? | |
| A. | I developed this view in reaction to this particular set of circumstances. | |
| Q. | Are you aware of any other situation where reserve funds under a HUD mortgage have been converted to liquidation funds upon termination of the regulatory agreement? | |
| A. | No. | |

See Horton Deposition at 118:25-119:1-17.

[13] Specifically, after the sale of the Property was approved, Holco was in possession of $4,500,000 of KGC's reserve funds ($1,800,000 of which was credited towards the payment of the Mortgage).  Horton Deposition at 54:5-12.  In January of 2008, Holco paid back a $1,450,000 loan from Libertyville Bank.  Id. at 55:7-22.  In February of 2008, Holco paid Wells Fargo $2,000,000 on an operating credit line.  Id. at 55:25-56:1-18.  Additionally, Holco paid HSL Financial $1,100,000 on an operating credit line.  Id. at 58:3-25-59:1-2.  Finally, sometime between May and July of 2008, Horton transferred around one million
(continued...)

11

In its 10/15/09 Order, the Court granted summary judgment as to conversion against Holco and awarded Plaintiff $2,703,561.77.  Plaintiff now seeks the same amount against Defendant Horton on the grounds that Horton is individually liable to the same extent as Holco.  <u>See</u> MSJ Against Horton Mem.[14/]  Offsetting the final mortgage payment and factoring in interest, Plaintiff contends that KGC is owed $2,703,561.77 from Horton.[15/]

**LEGAL STANDARDS**

I.        **Summary Judgment**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

---

[13/](...continued) dollars into an account at Raymond James, which later depleted to $300,000 as a result of "the crash" in the economy.  <u>Id.</u> at 83:8-19.

[14/] In its MSJ Against Holco, Plaintiff reserved the right to pursue any rights it may have against Horton.

[15/] Plaintiff has reserved the right to determine the accuracy of this amount after discovery and to confirm and pursue any rights it may have in the event the actual remaining reserve funds are greater than $2,703,561.77 (after offsetting the final mortgage payment).

Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation omitted).[16/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller, 454 F.3d at 987.  The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.[17/]

---

[16/] Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[17/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Miller, 454 F.3d at 987.  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court
(continued...)

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See id. at 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[18/] The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630-31.[19/]  Accordingly, if

----

[17/](...continued)
an absence of evidence from the nonmoving party.  Id.

[18/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[19/] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.
(continued...)

"reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  <u>Anderson</u>, 477 U.S. at 250–51.

## II.        Choice-of-Law

In diversity cases, the law of the forum state is applied in choice-of-law analyses.  <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 628 (1964).  Because Hawai'i is the forum state, this Court must analyze which law applies under Hawai'i choice-of-law rules.

Under Hawai'i choice-of-law rules, the Court is to look "to the state with the most significant relationship to the parties and subject matter."  <u>Roxas v. Marcos</u>, 89 Hawai'i 91, 117 n.16, 969 P.2d 1209 (1998).  The Hawai'i Supreme Court has instructed this Court to look at factors such as (1) where relevant events occurred, (2) the residence of the parties, and (3) whether any of the parties had any particular ties to one jurisdiction or the other.  <u>See</u> <u>id.</u>  Further, "there is a presumption that Hawaii law applies unless another state's law 'would best serve the interests of the states and persons involved.'"  <u>UARCO Inc. v. Lam</u>, 18 F. Supp. 2d 1116, 1123 (D. Haw. 1998).

Almost all of the factors in this case weigh in favor of Hawai'i law governing the instant dispute.  First, the Kukui

---

[19]/(...continued)
1994).

Gardens property is located in Hawai'i.  Second, the Regulatory

Agreement in dispute was entered into in Hawai'i.  Third, Horton

serviced the mortgage by contacting KGC to receive reserve funds

and by keeping KGC apprised of the status of these accounts.

Finally, this Court recognizes there is a presumption that

Hawai'i law applies.  See UARCO Inc., 18 F. Supp. 2d at 1123.

Accordingly, the Court holds that Hawai'i law will govern with

regard to the individual liability of a corporate officer.

### DISCUSSION

In its 10/15/09 Order, the Court held:

> [T]hat at the time Plaintiff requested return of
> the funds, (1) Plaintiff had ownership or a right
> to possession of the funds, (2) Defendant Holco
> refused to return these funds which Defendant
> admittedly possessed, and (3) Plaintiff suffered
> damages as a result.  Having concluded that both
> the Replacement Reserve Fund and Residual Receipts
> Fund belong to Plaintiff, the Court finds that
> Defendant Holco, construing all evidence and
> reasonable inferences drawn therefrom in a light
> most favorable to Defendant, converted the funds
> of Plaintiff in the amount of $2,703,561.77, thus
> warranting summary judgment.

10/15/09 Order at 33-34 (footnote and citations omitted).  In

reaching this conclusion, the Court found that Defendant Horton

acted as a trustee on behalf of Plaintiff and that, after

Plaintiff rightfully requested return of the Replacement Reserve

and Residual Receipts funds, Defendants refused to return said

funds.[20/]

I.        **The Court's 10/15/09 Order**

          Defendants' Opposition is essentially a request for the

Court to reconsider its 10/15/09 Order.  Opposition at 17

("[Horton] is asking the court to again review the ownership

issue in light of the additional evidence that he, personally, is

submitting to the court.").  Defendants, however, have not filed

_____

[20/] In its 10/15/09 Order, the Court explained:

          It is undisputed that the Regulatory Agreement
          governs the relationship between the mortgagor and
          servicing mortgagee.  And, in fact, this document
          alone can establish a fiduciary relationship.
          Moreover, the Servicing Agreement between
          Plaintiff and Defendants states that the servicing
          mortgagee is to invest the Replacement Reserve
          Fund and Residual Receipts Fund on behalf of the
          mortgagor.  Further, in Horton's letter dated
          December 12, 2007, in which Horton suggested that
          the reserves funds be used to offset the money
          owed Defendants, Horton wrote "[a]s for payment,
          we owe you $3,155,789.722 plus the other deposit
          of 996,723.53."  In the same letter, Horton used
          such terms as "Replacement Reserves Principal Due"
          and "Total Project Deposits Payable".  Finally,
          Horton's January 19, 2008, letter to First
          American Title Company clearly indicates that the
          escrow balance is being held by Defendants to
          compensate Defendants for servicing the Mortgage
          for twenty-one years and for seeking HUD's
          approval to prepay the note, and does not suggest
          that the reserve funds belong to Defendants.

          It is undisputed that Plaintiff has requested
          return of the Replacement Reserve and Residual
          Receipts funds upon prepayment of the mortgage and
          that Defendants have refused to return said funds.

10/15/09 Order at 15-16 (citations omitted).

a motion for reconsideration of the 10/15/09 Order.[21/]

Plaintiff argues that the Court need not reconsider whether Holco converted Plaintiff's funds because the Court granted summary judgment against Holco in its 10/15/09 Order and that decision is now the "law of the case."  MSJ Mem. at 10-11 (citing <u>Wong v. City and County of Honolulu</u>, 66 Haw. 389, 665 P.2d 157 (1983)).[22/]  "Under the 'law of the case' doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case."  <u>United States v. Alexander</u>, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotations and citations omitted); <u>see also</u> <u>United States v. Connell</u>, 6 F.3d 27, 30 (1st Cir. 1993)

_____

[21/] Pursuant to Local Rule 60.1, motions for reconsideration of interlocutory orders may be brought only upon (a) discovery of new material facts not previously available, (b) intervening change in law, or (c) manifest error of law or fact.  D. Haw. Local Rule 60.1(a)-(c).  Defendants have not suggested that (a) or (b) are applicable, as Defendants have not discovered any new material evidence and there has been no change in the applicable law, and motions for reconsideration brought under (c) must be made within fourteen days after the Court's written order is filed.  <u>Id.</u>

[22/] At the hearing on this matter and in its Opposition, Defendants, relying on <u>Wong v. City and County of Honolulu</u>, 66 Haw. 389, 665 P.2d 157 (1983), incorrectly argue that this Court should review its prior decision if "cogent reasons" exist to do so.  <u>See</u> Opposition at 18.  In <u>Wong</u>, the Hawai'i Supreme Court explained that when a second court is presented with an issue that has already been decided, the second court should only modify a prior ruling of a <u>separate</u> court of equal and concurrent jurisdiction if there are cogent reasons to do so.  <u>Wong</u>, 66 Haw. at 396, 665 P.2d at 162.  In this case, as explained above, the "law of the case" doctrine governs whether the Court should reconsider its 10/15/09 Order.

("[L]aw-of-the-case rules afford courts the security of consistency within a single case while at the same time avoiding the wastefulness, delay, and overall wheel-spinning that attend piecemeal consideration of matters which might have been previously adjudicated."). For the law of the case doctrine to apply, "the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." United States v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000). The law of the case doctrine, an imminently practical rule, "is designed to aid in the efficient operation of court affairs." Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir. 1990). For that reason, reconsideration of questions previously decided is generally improper. United States v. Mills, 810 F.2d 907, 909 (9th Cir. 1987).

The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion. Arizona v. California, 460 U.S. 605, 618 (1983); see also Fed. R. Civ. P. 54(b) (noting that, until a court expressly directs entry of final judgment, an order that resolves fewer than all of the claims among all of the parties "is subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties"). "A court may have discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3)

19

the evidence [] is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.  Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." Alexander, 106 F.3d at 876 (internal quotations omitted).

In this case, the Court finds no reason to depart from its decision in the 10/15/09 Order.  The Order explicitly addressed the issue of whether Holco converted Plaintiff's funds. See 10/15/09 Order.  Because the Court has already decided this issue, it should only depart from the decision in its prior Order if one of the exceptions apply.  See Alexander, 106 F.3d at 876. In this case, none of the exceptions are applicable.

First, the Court's 10/15/09 Order was not clearly erroneous.  Defendants do not argue that the Court's determination was clearly erroneous, but instead rehash the same arguments presented to the Court in opposition to Plaintiff's MSJ against Holco, and also submit a few additional theories as to why Holco is entitled to the Replacement Reserve and Residual Receipts funds by way of Horton's Second Declaration.[23]

---

[23] Defendants argue that summary judgment against Horton is inappropriate because:

> 1) The replacement reserve and residual receipts funds were part of the mortgage payments.  2) Holco had the right to control said funds after
> (continued...)

Accordingly, the first exception does not apply.

Second, Defendants do not argue that there has been an intervening change in the law since the Court's 10/15/09 Order, and the Court finds that there have been no intervening changes in the law.  See Reply at 4.  Therefore, the second exception does not apply.

Third, there is no evidence before the Court that is substantially different than what was presented in opposition to Plaintiff's MSJ against Holco.  In fact, many of the arguments made in the Opposition are identical to the arguments raised in Defendants' opposition to the MSJ against Holco, as Defendants present the same hypothetical arguments that were raised and rejected by the Court in its 10/15/09 Order.  Compare Opposition at 5 (arguing that Defendants own the Replacement Reserve and

_____

[23]/(...continued)
receiving them from plaintiff.  3) There is no provision in the regulatory agreement or the HUD regulations that require Holco to return the replacement reserve funds and residual receipts funds to plaintiff after plaintiff paid same to Holco.  4) Holco fulfilled every fiduciary duty stated in the HUD regulations and cited by the court in its prior order granting KGC partial summary judgment against Holco for conversion. 5) There is no fiduciary duty stated in the regulatory agreement or HUD regulations that mandates that return of the replacement reserves and residual receipts after HUD terminates its insurance and its involvement in the loan process.

Opposition at 15.  All of these arguments were raised and rejected by the Court in its 10/15/09 Order.  See 10/15/09 Order at 14-34.

Residual Receipts funds because, if the Plaintiff had defaulted
on the Mortgage, Defendants would have been entitled to use said
funds to cure the default) with 10/15/09 Order at 22-23
(rejecting this hypothetical on the grounds that Defendants'
hypothetical merely explained one of the purposes of the
Replacement Reserve and Residual Receipts funds and did not
establish Defendants' ownership over said funds) and compare
Opposition at 6 (arguing that Defendants own the Replacement
Reserve and Residual Receipts funds because, if Defendants had
refused to procure HUD's termination of its insurance and
Plaintiff had proceeded to sell the property, Defendants would
have sole control over said funds) with 10/15/09 Order at 23-24
(rejecting this hypothetical on the grounds that Defendants'
hypothetical only illustrated that Defendants would continue to
hold the funds in trust in that situation, and further observing
that those are not the facts of the instant case).

Defendant Horton's Second Declaration, which Defendants
argue should convince the Court to reach a different result than
it did in its 10/15/09 Order, is simply a rehash of the arguments
and positions the Court has already considered and rejected,
along with a few additional legal arguments and conclusory
statements that Holco is entitled to the Replacement Reserve and
Residual Reserve funds because Plaintiff is a non-profit
mortgagor and therefore should not be able to profit from the

sale of the Property.  In other words, there is no new <u>evidence</u> in dispute, but instead new arguments that Horton has formulated after having additional time to review the Regulatory Agreement.[24/]  In addition, Horton's Second Declaration is not based on personal knowledge, but instead offers legal opinions and conclusory statements as to why Holco is entitled to the Replacement Reserve and Residual Receipts funds under the Regulatory Agreement and applicable regulations.[25/]  Accordingly, the third exception does not apply.

Fourth, Defendants do not argue that other changed

---

[24/] In their Opposition, Defendants assert that Horton's Second Declaration is not barred by <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991), which states that "a party cannot create an issue of fact by an affidavit contradicting his prior testimony."  Defendants argue that the Second Declaration cannot be disregarded by the Court unless the Court determines that the Second Declaration is a "sham." Opposition at 8-11.  The Court need not address the issue of whether the Second Declaration is a sham, because, as described above, the Court finds that it need not reconsider its 10/15/09 Order, and even if the Court were to consider the Second Declaration its decision would remain unchanged.

[25/] Defendant argues that "the court must disregard credibility concerns and believe [Horton's] first and second declarations and his cited deposition testimony in evaluating whether the declarations, deposition testimony, and the regulatory agreement's corroborating provisions establish genuine issues of material fact for trial as to whether [Horton] should be personally liable for conversion."  Opposition at 11.  As explained in its 10/15/09 Order, "[t]he material facts in this case are not in dispute as both parties agree that Plaintiff has been the mortgagor of Kukui Gardens since 1969, at which time the property became a HUD-insured property subject to the Regulatory Agreement."  10/15/09 Order at 15.  Horton's Second Declaration merely advances more legal arguments and conclusory statements and therefore does not create genuine issues of material fact.

23

circumstances exist.  All of the information included in Horton's Second Declaration was available to Defendants at the time of the MSJ against Holco.  The Second Declaration merely makes reference to HUD regulations and the HUD handbook to argue that, under the Regulatory Agreement, Defendants are entitled to the Residual Receipts and Replacement Reserve funds.  Nowhere in the Second Declaration does Horton state that the "evidence" contained in his declaration is newly discovered, or unavailable to him at the time of the MSJ against Holco.  Therefore, the fourth exception does not apply.

Fifth, and finally, manifest injustice would not result if the Court declines to reconsider its 10/15/09 Order.  As indicated above, Horton's Second Declaration does not provide additional evidence, but rather sets forth additional legal arguments and conclusory statements as to why Holco is entitled to the Replacement Reserve and Residual Receipts funds.

Further, even if the Court were to consider Horton's Second Declaration and additional arguments, the Court would not modify its decision in the 10/15/09 Order.  In Horton's Second Declaration, Horton asserts that 1) § 221(d)(3) of the National Housing Act prohibits a non-profit mortgagor from making a profit, 2) 24 C.F.R. § 880.205 prohibits a non-profit mortgagor from making a profit, 3) Plaintiff had ownership of the "real estate" but not the "project estate", and 4) HUD Handbook 4350.1

24

Rev-1 Section 13-19 relating to Remuneration to Nonprofit Sellers prohibits Plaintiff from making a profit.  None of these claims have merit.

All of these regulations and HUD Handbook provisions merely indicate that, while a HUD-insured regulatory agreement is in effect, a non-profit mortgagor is not permitted to make a profit.  None of these provisions state that after a HUD-insured regulatory agreement is terminated, a non-profit mortgagor is still not allowed to make a profit on the previously regulated property.  Defendants concede this very point by stating, "[o]n December 7, 2007, HUD terminated its insurance on the project . . . [t]his is why KGC was able to avoid the letter and spirit of the regulatory agreement regarding non-profit organizations not profiting from low and moderate income housing projects by selling the property for $132,000,000."  Opposition at 17.  Upon termination of the Regulatory Agreement, the insurance terminated and the restriction that a non-profit mortgagor cannot profit no longer applied to Plaintiff, permitting Plaintiff to sell the Property as it saw fit.  Defendants' argument, taken to its logical extreme, would entitle Defendants to any profit Plaintiff received from the _sale_ of the Property, even if this took place after the HUD insurance was terminated, as this would be profit that Plaintiff received from its investment in the Property.  See Opposition at 4.  Clearly, this cannot be the case.  Further, as

the Court stressed in its 10/15/09 Order, HUD has requested that Defendants return the Replacement Reserve and Residual Receipts funds to Plaintiff.  10/15/09 Order at 9.

Defendants also raise a few new arguments in Opposition to the current MSJ against Horton.  Defendants point to various sections of the Regulatory Agreement, which although not specifically included in the Court's 10/15/09 Order were addressed by the Court, to argue that Holco is entitled to the Replacement Reserve and Residual Receipts funds.  None of these sections, however, support Defendants' position.

First, Defendants point to sections of the Regulatory Agreement which state that the Replacement Reserve and Residual Receipts funds "shall at all times be under the control of the mortgagee."  Opposition at 15.  As already explained in the Court's 10/15/09 Order, the use of the word "control" merely establishes that these funds were to be held in trust by the mortgagee under its control.  10/15/09 Order at 22-23.

Second, Defendants point to § 11(a)(2) which states that after default the mortgagee "may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner [of HUD] as provided in the Regulations" and argue that "[t]his provision permitted Holco to foreclose on KGC if KGC had not made the mortgage payments to Holco . . . [which] included principal,

interest, insurance and replacement reserve payments . . . ."
Regulatory Agreement at § 11(a)(2); Opposition at 16.  Again,
this hypothetical situation was raised and addressed by the Court
in its 10/15/09 Order as the Court observed that this provision
of the Regulatory Agreement merely evidences that one of the
purposes of the Replacement Reserve and Residual Receipts funds
was to protect against default and that, in this case, Plaintiff
did not default on the Note and Mortgage.  Therefore, § 11(a)(2)
of the Regulatory Agreement is inapplicable.  See 10/15/09 Order
at 22-23 (observing that the fact that Defendants could use the
Replacement Reserve and Residual Receipts funds to protect
against default did not establish Defendants' ownership over said
funds).  Moreover, in the event of a default, which is not the
case here, then upon foreclosure the reserve funds would be
available to the mortgagee for payment of the mortgage
indebtedness.  But again, here there has been no default which
might trigger a foreclosure; instead, the mortgage indebtedness
has been paid in full and the mortgage released, and consequently
the reserve funds should be delivered to Plaintiff.

        Third, and finally, Defendants point to § 15 of the
Agreement, which states that the Regulatory Agreement binds the
parties to the agreement "so long as the contract of mortgage
insurance continues in effect," and argue that, "[o]n December 7,
2007, HUD terminated its insurance on the project . . . [and] at

27

this time, the mortgage on the property became uninsured, the regulatory agreement became ineffective, and HUD ceased its involvement with the Kukui Gardens." Opposition at 17.  To this end, Defendants argue that Holco became the owner of the Replacement Reserve and Residual Receipts funds after the Regulatory Agreement terminated, even though HUD requested that Defendants return said funds to Plaintiff.[26/]  Id.  This argument was made and rejected by the Court in its 10/15/09 Order, and Defendants have done nothing to strengthen their far-fetched position in opposition to the MSJ against Holco.  See 10/15/09 Order at 31 ("Every source the Court has examined unequivocally confirms that the Replacement Reserve Fund and Residual Receipts Account are assets of the mortgagor and upon prepayment of the mortgage must be returned to the mortgagor.").  Accordingly, because manifest injustice would not result from the Court's decision to not reconsider its 10/15/09 Order, the fifth

_____

[26/] Defendants further argue that, because Holco was able to credit Plaintiff $1,800,000 as final payment on the Note and Mortgage, Holco must have owned the Replacement Reserve and Residual Receipts funds because, "to have credited the funds, Holco must have owned the funds."  Opposition at 17.  This position is entirely without merit.  After HUD terminated the insurance, Defendants were in possession of over $4 million of Plaintiff's funds.  See 10/15/09 Order at 6-7.  In order to prepay the Note and Mortgage, however, Plaintiff needed to make a final mortgage payment of approximately $1.8 million.  The "crediting" of the final mortgage payment merely reduced the amount Defendants owed Plaintiff as, for the reasons discussed in the 10/15/09 Order, Plaintiff is entitled to the remaining Replacement Reserve and Residual Receipts funds after factoring in the final mortgage payment.

exception does not apply.

In conclusion, the Court's 10/15/09 Order holding that Holco converted the funds of Plaintiff is the "law of the case" and the Court finds no reason to disturb this ruling.  Further, even if the Court were to consider Horton's Second Declaration, the Court's conclusion that Holco converted Plaintiff's funds would remained unchanged.  Accordingly, the Court will proceed with its analysis to determine whether Horton actively or passively participated in Holco's tortious conduct.

## II.        Individual Liability of Horton

Given that the Court has already found that Holco converted Plaintiff's funds, and that Horton has acted as President of Holco since its inception, the central question presented by the instant MSJ Against Horton is whether Horton actively or passively participated in the tortious conduct.[27]

---

[27] At the hearing on this matter, Defendants asserted that, because the Court has found Holco liable for conversion in its 10/15/09 Order, it would be improper to also find Defendant Horton liable because Count II of the First Amended Complaint asserts a claim for conversion against _either_ Holco or Horton. This assertion has no merit.  Count II of the First Amended Complaint clearly asserts claims against _both_ defendants as it states "Defendant HC MORTGAGE, Defendant HOLCO _and/or_ Defendant HORTON have wrongfully retained monies from the Replacement Reserves and Residual Reserves, thereby wrongfully depriving KGC of funds that rightfully belong to KGC . . . [which] constitute[s] the conversion of KGC's property rights."  Compl. ¶¶ 81-82 (emphasis added).  As discussed above, under Hawai'i law corporate officers may be personally and separately liable for the tortious act of a corporation if they actively or passively participate in such wrongful conduct.  See _Fuller_, 78 Hawai'i at
(continued...)

29

Under Hawai'i law, "it is well established that officers, directors, or shareholders of a corporation may be personally liable for the tortious conduct of the corporation, if they actively or passively participate in such wrongful conduct." Fuller v. Pac. Med. Collections, Inc., 78 Hawai'i 213, 225, 891 P.2d 300, 312 (App. 1995) (citing Cahill v. Hawaiian Paradise Park Corp., 56 Haw. 522, 543 P.2d 1356 (1975)); see also Burgess v. Arita, 5 Haw. App. 581, 594, 704 P.2d 930, 939 (1985) ("Where corporate officers or directors participate in the tortious conduct . . . they are not shielded by the corporation and will be personally liable."). Other jurisdictions are in accord. See Comm. for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 823 (9th Cir. 1996) (applying Idaho law and observing that "'[a] corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf'" (quoting Transgo, Inc v. Ajac Transmission Parts Corp., 768 F.2d 1001 (9th Cir. 1986))); Linares v. Richards, No. 08-CV-3243, 2009 WL 2386083 (E.D.N.Y. Aug. 03, 2009) ("[B]ecause conversion is a tort, a corporate officer can be held individually liable under that theory of liability, even if that officer acted within the scope of his

---

[27]/(...continued)
225, 891 P.2d at 312.

employment . . . ."); <u>Singapore Recycle Centre PTE Ltd. v. KAD</u>

<u>Int'l Marketing Inc.</u>, No. 06-CV-4997, 2009 WL 2424333 (E.D.N.Y.

Aug. 06, 2009) ("When a corporate officer or president knowingly

commits conversion, s/he is jointly and severally liable with the

corporation for the tort.").

Under Hawai'i law, where there is participation by

corporate officers or directors in tortious conduct, "they are

not shielded by the corporation and will be personally liable."

<u>E. Star, Inc. S.A. v. Union Bldg. Materials Corp.</u>, 6 Haw. App.

125, 135, 712 P.2d 1148, 1155 (1985) (citations omitted).[28/]  In

other words, there is no need to pierce the corporate veil to

---

[28/] Am. Jur. 2d Corporations § 1629 explains the rationale
behind this rule:

> If . . . a director or officer commits or
> participates in the commission of a tort,
> whether or not it is also by or for the
> corporation, he or she is liable to injured
> third persons, and it does not matter what
> liability attaches to the corporation for the
> tort.  A contrary rule would enable a
> director or officer of a corporation to
> perpetrate flagrant injuries and escape
> liability behind the shield of his or her
> representative character, even though the
> corporation might be insolvent, or
> irresponsible. . . .  Thus, a director or
> officer who commits the tort or who directs
> the tortious act done, or participates or
> operates therein, is liable to third persons
> injured thereby, even though liability may
> also attach to the corporation for the tort.

18B Am. Jur. 2d Corporations § 1629 (2008).

establish the personal liability of a corporate officer for the tortious conduct of a corporation.  See id.

In this case, construing all evidence and reasonable inferences drawn therefrom in the light most favorable to Defendant Horton, the Court finds that summary judgment against Horton as to Count II of the First Amendment Complaint is appropriate.  It is undisputed that the conversion by Holco was committed by and through Horton.  Horton candidly admitted that "all acts of Holco were done by [him] in [his] capacity as president" and that "Holco did not act unless [he] did something."  See Horton Deposition at 213:17-22.  Horton also testified that he was the one who decided to take the position that Holco was entitled to the Replacement Reserve and Residual Receipts funds.  See id. at pp. 116-19.  Indeed, Horton has been the President of Holco since its inception and, with the exception of Mr. Crowley serving as Secretary from 1999-2007, Horton has been the sole officer and employee of Holco since 1998.  Id. at pp. 27-28.  Finally, Horton also testified in his deposition that he used the Replacement Reserve and Residual Receipts funds to pay off creditors and lenders.  See id. at pp. 54-56, 58-66, 83-84, 117.  Based on this, Horton concedes that, "if the court refuses to revisit whether Holco committed conversion, or, after revising said issue considering [Horton's] second declaration, continues to hold that Holco committed

conversion, and further deems that KGC has presented the court with sufficient, competent evidence that [Horton] actively or passively participated in Holco's conversion, then an imposition of personal liability for [Horton] is inevitable."  Opposition at 13.[29/]

In sum, the Court has already granted summary judgment against Holco for conversion, a tortious act.  See 10/15/09 Order.  As discussed above, the 10/15/09 Order remains the law of the case, and even if the Court were to consider Horton's Second Declaration, its decision would remain unchanged.  All acts of Holco were done by and through Horton, and therefore Horton actively participated in the tortious conduct.  Accordingly, Horton is personally liable for his tortious acts.  See Fuller, 78 Hawaii at 225, 891 P.2d at 312 ("[I]t is well established that officers, directors, or shareholders of a corporation may be

_____

[29/] On January 4, 2010, Kukui Gardens Corporation filed an involuntary chapter 7 bankruptcy petition for Holco Capital Group, Inc. in the Bankruptcy Court for the Northern District of Indiana.  At the hearing on this matter, Defendants argued that Holco's involuntary bankruptcy filing should prevent the Court from granting summary judgment against Horton.  As discussed above, however, because a corporate officer's individual liability is separate and distinct from the liability of the corporation, the Court finds that Holco's bankruptcy status does not affect the instant MSJ against Horton.  Nevertheless, Defendants contended they have not had an opportunity to research whether the bankruptcy filing should preclude the Court from ruling on this matter (notwithstanding Plaintiff's representation it notified Defendants by e-mail on January 5, 2010, of such filing); and accordingly the Court has allowed Defendants to file a timely motion for reconsideration should they find authority supporting their position.

personally liable for the tortious conduct of the corporation, if they actively or passively participate in such wrongful conduct.").

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment on Count II of the First Amended Complaint as to Defendant Horton in the amount of $2,703,561.77.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, January 12, 2010.



_____
Alan C. Kay
Sr. United States District Judge

Kukui Gardens Corporation v. Holco Capital Group, et al., Civ. No. 08-00049 ACK-KSC: Order Granting Plaintiff's Motion for Partial Summary Judgment on Count II of the First Amended Complaint as Against Defendant Horton.